In the Interest of A.M.W., a minor.

**Pulaski County Juvenile Office, Respondent,**

v.

**D.P., Appellant.**

**No. 24208.**

Missouri Court of Appeals, Southern District, Division Two.

Jan. 24, 2002.

John M. Farris, Waynesville, for appellant.

Brian G. Ellsworth, Ellsworth & Ellsworth, L.L.C., Cabool, Elizabeth LaFlamme, Jefferson City, for respondent.

PHILLIP R. GARRISON, Presiding Judge.

D.P. ("Mother") appeals a judgment terminating her parental rights with reference to her daughter, A.M.W., born on October 23, 1997. The issues for decision relate to the validity of a Consent to Termination of Parental Rights and Consent to Adoption (the "Consent") signed by Mother; whether the trial court erred in admitting a letter written by Mother to A.M.W. contemporaneously with her signing of the Consent; and whether termination of Mother's parental rights is in A.M.W.'s best interests.

M.P., Mother's stepmother, contacted Anne Myers, a social service worker with the Division of Family Services ("DFS") on December 7, 1999, concerning the possibility of placing A.M.W. for adoption. This was apparently after Mother, herself, had contacted the DFS office concerning the same subject. Ms. Myers and her supervisor, Amy Poyser, went to the home of Mother's father and stepmother, where Mother and A.M.W. had been staying. Mother told the workers that she wanted them to take A.M.W. into foster care for the purpose of placement for adoption.

A.M.W. was removed from the home on that day. The next day, a request for detention was filed by the juvenile officer, and A.M.W. was ordered detained by the juvenile court. Mother also appeared at the DFS office on December 8, 1999, saying that she wanted to sign a consent to the termination of her parental rights and to adoption that day because she was considering leaving the area. Ms. Poyser testified that she went through the form with Mother, reading each portion of it to her, and that Mother then signed it in front of a notary.

A petition to terminate Mother's parental rights was filed on July 20, 2000 alleging, *inter alia,* that Mother had voluntarily signed the Consent to terminate her parental rights and to adoption. After a bench trial, the juvenile court entered a judgment. In doing so, it found that Mother had signed the Consent, having the capacity to know and understand the consequences of her actions. It also found that although Mother may have been depressed when she signed the Consent, there was no cogent evidence that such depression overcame her free will. Accordingly, the trial court's judgment terminated Mother's parental rights. She appeals from that judgment.

The judgment in a termination of parental rights case will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *In the Interest of D.C.H.,* 835 S.W.2d 533, 534 (Mo. App. S.D.1992). Due regard is to be given to the trial court's ability to assess the credibility of witnesses. *Id.* In reviewing a termination of parental rights case, we consider the facts and reasonable inferences therefrom in the light most favorable to the trial court's judgment. *Id.*

In her first point on appeal, Mother contends that the juvenile court abused its discretion in terminating her parental rights because "the uncontroverted weight of the evidence indicated that [she] was under duress of circumstances at the time she executed the documentation terminating her parental rights." In support, she relies largely on the testimony of Dr. Theodore Wachs, a psychiatrist, and Dr. Earl Arnold, a licensed psychologist.

Dr. Wachs testified that he saw Mother once, on October 6, 1999. On that visit, he conducted a one-hour clinical interview and administered a Beck Depression Inventory test. Dr. Wachs's diagnosis was major depression, "single episode" with a possibility of preexisting dysthymia. He said that whether a person with that type of diagnosis could function rationally depends on the situation and the person. He said that it is very difficult for a person with major depression to function at a level that is consistent with being an effective adult, and that a person with that condition should not be making major decisions. Although Dr. Wachs prescribed medication for Mother, he concluded that her condition would not have cured itself between the time he saw her and December 8 when she signed the Consent. When asked if he had an opinion about whether Mother had the mental capacity to understand her actions when she executed the Consent, Dr. Wachs said, "I would suggest that she probably didn't or that, if she did, she didn't understand or appreciate the significance of it." He later said that in his opinion, Mother did not have the mental capacity to execute the Consent, and that he didn't think that she understood the significance of it. He admitted, however, that he did not know the level of her functioning in December (when she signed the Consent) because he did not see her then. He also said that if Mother had responded to the medication he prescribed in the same manner as 80% of the people would, she would have seen significant improvement in her condition, including her ability to deal with everyday life. Finally, he said that major depression lasts from six months to one year; that Mother had the depression before he saw her; and that he had no indication of how long the depression lasted after he saw her.

Dr. Arnold saw Mother on one occasion, March 9, 2001, at the request of her attorney. In a four-hour session with her, Dr. Arnold did a clinical interview and conducted various tests. In his opinion, she had both a "depressive condition" that she had had for at least longer than four or five years, and an "anxiety disorder condition." He said that one of the symptoms of her condition is that she would have difficulty relating to others, and would "simply back away or not be there." He also said that the depression and anxiety could "easily affect her ability to make rash decisions," and that in his opinion, even if the Consent had been read to her, she would not have had the ability to understand it.

Mother testified that she called the DFS originally because of problems she had with her father and stepmother, with whom she was living. She and A.M.W. had previously been asked to leave her father's home when it was cold and she had no money. The next day she returned to her father's home and seemed to straighten things out with him. Her father, however, left that day for a trip out of state, leaving Mother with her stepmother. According to Mother, her stepmother was degrading and mean to her when her father was absent, and that behavior commenced the evening he departed for his trip. Mother said that she was afraid her stepmother would throw her and A.M.W. out of the house while her father was gone, so she called DFS the next day, asking to speak with "somebody from adoption." She told them that she needed someone to come after her baby. When she was told that there had to be a reason for them to pick up children such as neglect, abuse or abandonment, Mother told the DFS worker that she was afraid that she was going to hurt A.M.W. Mother testified, however, that that was a lie she told to protect her daughter if they were again thrown out of the house.

Mother testified that she was told by the DFS worker, who took A.M.W. from the home on December 7, that she needed to sign a paper within twenty-four hours or they would be unable to hold A.M.W. in their custody. The next day, Mother went to the DFS office and signed the Consent after the worker went over the document with her. She testified that, although the worker read the Consent form to her, she was told that it was "temporary until seen by a judge." Mother testified that although she understood the word "adoption" and that it referred to something that was permanent, she did not understand the Consent that she signed. Mother also admitted that the DFS worker told her when she came to the home to pick up A.M.W. that there were services available for her that might provide alternatives to her giving up her daughter for adoption, but that she had already lied to the DFS about the reason she wanted her daughter to be picked up, and she knew that she didn't need the other services.

Amy Poyser, a DFS worker, testified that she and another worker, Anne Myers, met with Mother on December 7, 1999 in response to a call from Mother's stepmother. Ms. Poyser testified that Mother told them that she had not connected or bonded with A.M.W. since birth, that the child was mean, that she might hurt her if the child was not removed, she wanted them to take A.M.W. into foster care for the purpose of placement for adoption, and that she wanted to terminate her parental rights. When they arrived, Mother had A.M.W.'s shot record, Social Security card, birth certificate, and other items ready for them. Ms. Poyser said that she told Mother about services that were available to help her keep her child, but Mother was insistent that they take A.M.W. that day. According to Ms. Poyser, Mother appeared rational, and said that she had thought about placing A.M.W. for adoption for a long time, but had been fearful of what people would think. Ms. Poyer said that she attempted, to no avail, to convince Mother to keep A.M.W. so that Mother's father could at least have a closing visit with the child. She also asked Mother to attend a meeting two days later at which she could discuss the matter with the juvenile officer.

Mother, however, came to the DFS office the next day, and, although again reminded of the opportunity to discuss the matter with the juvenile officer the next day, insisted that she wanted to sign the Consent to terminate her parental rights, saying that she might be leaving the area. Ms. Poyser said that she read the form to Mother, and even unsuccessfully encouraged her to wait to sign it until after the meeting scheduled for the following day. According to Ms. Poyser, there was nothing about Mother that indicated she did not understand what she was doing when the Consent was read to her and she signed it.

The Consent signed by Mother was titled "Consent to Termination of Parental Rights and Consent to Adoption." It provided, *inter alia*, "[b]ecause I believe it is in the best interests of the Child and his or her future welfare, I voluntarily and of my own free will forever consent to the termination of my parental rights and obligations," and "I voluntarily and of my own free will forever consent to any lawful adoption of the Child."

The juvenile court found, *inter alia*, that Mother was offered services to prevent the removal of A.M.W. prior to her signing the Consent; Mother had the capacity to know and understand the consequences of her actions in signing the Consent; Mother was able to function properly, act appropriately and care for her child on a daily basis prior to the signing of the Consent;

Mother had the capacity to make cognitive choices on the date she signed the Consent; and, although Mother may have been depressed, there is no cogent evidence that, when she signed the Consent, that any such depression overcame her free will. It concluded, therefore, that Mother voluntarily consented to the termination of her parental rights and to the adoption of A.M.W. with an understanding of the consequences of her actions.

We are not provided with any pleading that may have been filed by Mother by which she contested the validity of the Consent signed by her. We note, however, that the legal file contains Mother's trial brief filed with the juvenile court in which she contended that the evidence indicated that she lacked the requisite mental capacity to adequately understand the consequences of her action in executing the Consent. It appears, therefore, that the issue presented to the juvenile court was whether she was capable of executing the Consent when she did so rather than any issue of whether she should be permitted to withdraw or revoke her consent. This conclusion is further supported by her first point relied on by which she attacks the termination of her parental rights because she was allegedly under "duress of circumstances" when she signed the Consent. Finally, Mother's attorney agreed at oral argument of this case that that was the issue concerning the Consent.

■ Contrary to the thesis of Mother's first point, the trial court was not required to believe her evidence over that which was contrary. Evidence in the record which might have supported a different conclusion does not necessarily demonstrate that the trial court's judgment is against the weight of the evidence. *In re C.M.B.*, 55 S.W.3d 889, 893 (Mo.App. S.D. 2001). An appellate court views the evidence and its reasonable inferences in a light most favorable to the decision. *In re N.M.J.*, 24 S.W.3d 771, 777 (Mo.App. W.D. 2000). The appellate court also defers to a trial court's ability to determine the witnesses credibility and to choose between conflicting evidence. *Id.* This is consistent with the premise that the trial court has leave to believe or disbelieve all, part or none of the testimony of any witness. *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455 (Mo. banc 1984). Here, there was substantial evidence to support the judgment as it relates to the validity of the Consent.

Mother's second point is stated in more general terms than the first point, but is also premised on the trial court's judgment being against the weight of the evidence. A determination of this point is effectively controlled by the discussion of the first point and is, therefore, denied.

The third point is based on the trial court's admission of a sealed letter that had been written by Mother to A.M.W. when she signed the Consent. Mother alleges that the letter "was not properly disclosed during pre-trial discovery ..."

■ Prior to trial, Mother served a "Request for Discovery," which provided that she requested "the following within ten (10) days and/or throughout the duration of this case, all as provided by V.A.M.R.Crim. Rules 25.03 and Civ. Rule 56.01."[1] Among the things requested were "[a]ny and all pleadings, documents,

---

1. Mother makes no attempt to demonstrate the applicability of Rule 25.03 of the Rules of Criminal Procedure to this case. Rule 56.01 contains the general provisions governing discovery authorized by Rules 57 through 60 of the Rules of Civil Procedure. No issue is raised concerning the propriety of designating the rules referenced by Mother as the basis for these discovery requests. Likewise, there is no issue about the time limit specified in the request for compliance.

material or information, within the possession or control of the juvenile officer and the [DFS] pertaining to said juvenile and/or her parents."[2] Mother also served subpoenas duces tecum on Ms. Poyser demanding that she appear for her deposition and produce "[a]ny and all writings, recorded statements, reports, memorandums, maps, diagrams, pictures, or other objects and documents relating to [A.M.W.], ... and [Mother], including, but not limited to your entire file or files."

At trial, the guardian ad litem made known to the court that there was a sealed letter addressed to A.M.W. contained in the DFS files, written by Mother contemporaneously with her signing of the Consent, and asked that it be opened and read in the record. Mother's counsel objected, saying that the letter had not been provided to him in response to the discovery referred to above. During the discussion that followed, it appeared that the letter had been discussed in a deposition (presumably that of Ms. Poyser). Mother's attorney admitted having had knowledge of the letter when he said that he was told that the letter was sealed until A.M.W. was eighteen, and by saying that Mother had been told to write the letter by "them."[3] When the trial court told Mother's attorney that "discovery is usually to find out things the other side has that you don't know about," the attorney responded that he wanted the opportunity for his experts to comment about the letter. Eventually, the trial court authorized the letter to be opened and reviewed by Mother and her attorney before it was seen by the other attorneys. After that review, Mother's attorney renewed his objection that the letter had not been produced in discovery, but in response to the trial court's inquiry about any requests he might have if it was admitted, said that they were not requesting a continuance and were not requesting that Mother's experts to be recalled. The letter was then admitted.[4] In announcing its decision at the close of the evidence, the trial court said, *inter alia:*

> The letter which was submitted, the sealed letter, is no—Either way, it's not a deciding factor for the Court, but it just is another piece of evidence showing that on December 7, 1999, you appeared to know what you were doing. You talked about your love for your daughter, which is undisputed. I don't—I don't think there's any doubt about that. But you said you thought at that time it was the right thing to do. There's not one word in here blaming anybody else or saying that your evil stepmother forced you to do this. You're telling your daughter that you cares [sic] for her, and that's why you were giving her up for adoption.

The trial court again recited that the letter was "not the determining factor for the

---

**2.** No issue is raised concerning the sufficiency of the description of the documents being sought.

**3.** Mother's attorney agreed, at oral argument of this case, that the existence of the sealed letter was disclosed and discussed at a pretrial deposition.

**4.** The letter was handwritten and contained statements such as "I wanted a better life for you and I thought you deserved at least just that"; "Mommy needs to finish growing up"; "I hope that you forgive me for this and want to see me again"; "I want to see you ... but the law won't permit me from [sic] knowing who you are with and where you will be living"; "[t]he state told me I could write this letter to you ..."; "I know this was the right thing for me to do"; "I hope you understand"; "I wanted to be able to keep contact with you throughout your life, but they won't let me do that ... They [sic] it would be too hard on you, me, and your new parents"; "I won't be able to watch you grow like I had planned on and at least let me see you again."

Court, but it's another piece of evidence, with all the other evidence, showing that at that time, you understood the situation. You understood that it was permanent. You understood that you wouldn't be able to see her."

■■ A trial court is vested with broad discretion as to its choice of a course of action during trial when the introduction of evidence is challenged on the ground that it has not been disclosed in response to appropriate discovery. *Gassen v. Woy,* 785 S.W.2d 601, 604 (Mo.App. W.D.1990). In the sound exercise of that discretion, it may admit or reject such evidence or impose other appropriate sanctions. *Id.* The arbitrary exclusion of evidence is not the only option available to the trial court, although it is one it may consider. *Id.* "The very nature of the discretion vested in the trial court recognizes that each case must be determined on its own peculiar facts which bear on the question of whether that discretion has been abused." *Id.* We will presume that a ruling within the trial court's discretion is correct, and the appellant bears the burden of proving that the trial court abused its discretion, and that he or she was prejudiced by such an abuse of discretion. *Tax Increment Fin. Comm'n of Kansas City v. Romine,* 987 S.W.2d 484, 487 (Mo.App. W.D.1999). Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Wilkerson v. Prelutsky,* 943 S.W.2d 643, 648 (Mo. banc 1997). If reasonable persons can differ as to the propriety of the trial court's action,

then it cannot be said that the trial court abused its discretion. *Id.*

In the instant case, we are unable to conclude that the trial court abused its discretion. Mother's attorney was aware of the letter prior to trial but apparently did nothing to enforce the earlier discovery requests. Obviously, Mother would have been aware of what was in the letter. After Mother and her attorney reviewed the letter, the only request was to completely exclude it, and they announced that there was no request for a continuance or to recall any of their experts. Finally, the trial court made it clear that the letter was not crucial to its decision. Accordingly, this point is denied.

■ In her fourth and final point, Mother contends that the trial court erred in not reuniting her with A.M.W. because the evidence "indicated that [Mother] had demonstrated her rehabilitation and capacity to perform her parental obligations such that this reunification is in the best interests of [A.M.W.]." She argues that Dr. Wachs and Dr. Arnold both testified that Mother was capable of performing her parental obligations in a normal manner without posing a threat to A.M.W.[5]

■ Section 211.444.1, RSMo 2000, provides, in pertinent part:

The juvenile court may, . . . terminate the rights of a parent to a child if the court finds that such termination is in the best interests of the child and the parent has consented in writing to the termination of his or her parental rights.

A finding that termination of parental rights is in the best interests of the child does not require proof by clear, cogent, and convincing evidence. *In re A.S.,* 38

---

5. Dr. Wachs testified that inasmuch as he had no fear that Mother would harm A.M.W. when he saw her, he had no fear of that at the time of trial. Dr. Arnold testified that any "reassembling" of Mother and A.M.W. should be gradual and overseen by trained professionals.

S.W.3d 478, 486 (Mo.App. S.D.2001). Such a determination is within the discretion of the juvenile court and will be disturbed on appeal only for an abuse of discretion. *Id.*

In its judgment, the juvenile court found that A.M.W. was then in an adoptive foster home, had been in several foster homes after being taken into custody by the DFS, and that it was in A.M.W.'s best interests that Mother's parental rights be terminated. This was supported by evidence that A.M.W. was in an adoptive foster home; that she was growing and developing intellectually and appeared to be happy; and that she had bonded with and looked to the prospective adoptive parents as her parents.

We are unable to conclude that the juvenile court's conclusion in this regard was an abuse of discretion. Mother's fourth and final point is denied.

The judgment is affirmed.

PARRISH, J., and RAHMEYER, J., concur.